**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**JOSEPH GLENN FLORENCE,**

    **Plaintiff,**

**v.**                                                    **Case No.: 8:13-cv-683-T-35-MAP**

**THE CITY OF LAKELAND, FLORIDA,
et al.,**

    **Defendant.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendants' Motion for Summary Judgment (Dkt. 44), Plaintiff's response in opposition thereto (Dkt. 54), and the parties' Stipulation of Agreed Material Facts (Dkt. 59).   Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court orders that the motion is GRANTED IN PART and otherwise HELD IN ABEYANCE, as detailed below.

## I.    BACKGROUND

Plaintiff Joseph Glenn Florence asserts claims pursuant to 42 U.S.C. § 1983 and Florida law against the City of Lakeland ("the City"), Officer Heather Freeman, and Officer Nicholas Ivancevich.   Plaintiff alleges that Officers Freeman and Ivancevich were issuing a trespass warning, which is a consensual encounter under Florida law, when they unlawfully arrested him for attempting to go back inside his house.   During the ensuing altercation, Plaintiff alleges that he was beaten, Tasered, and struck in the face with a heavy flashlight, resulting in fractures to his nose and orbital sockets.   The relevant facts

follow.

On March 8, 2011, Plaintiff's neighbor, Steven Roth, contacted the Lakeland Police Department to report that Plaintiff was on his property.   (Dkt. 48, "Roth Dep." at 6, 17; Dkt. 45, "Ivancevich Aff." at ¶ 3; Dkt. 59 at ¶ 1).   Officer Ivancevich and Officer Freeman ("the Officers") were dispatched to the scene.   (Dkt. 59 at ¶ 2).   When they arrived, Mr. Roth informed the Officers that Plaintiff had been watering and mowing Mr. Roth's lawn without his permission.   (Ivancevich Aff. at ¶ 4).   Mr. Roth informed the Officers that, earlier that day, he observed Plaintiff's hose connected to Mr. Roth's exterior water faucet, Mr. Roth returned the hose to Plaintiff, and he told Plaintiff again not to come on his property.   (Id. at ¶¶ 3-5).

The Officers walked across the street to Plaintiff's house.   (Dkt. 59 at ¶ 7). Plaintiff's wife answered the door, and Officer Ivancevich asked to speak with the gentleman who had a dispute with a neighbor regarding the neighbor's lawn.   (Ivancevich Aff. at ¶ 5).   Officer Ivancevich introduced himself and invited Plaintiff to discuss the situation with Mr. Roth's lawn.   (Id. at ¶ 6).   Plaintiff acknowledged that he had been mowing Mr. Roth's lawn for approximately one year, as well as watering the lawn for two or three weeks.   Plaintiff also acknowledged that he used Mr. Roth's water without permission.   (Id.).

When Officer Ivancevich asked Plaintiff why he was so concerned with Mr. Roth's lawn, Plaintiff became very assertive, told the officers that they did not know what they were doing, pointed his finger at the Officers, and said that he was going back inside. (Id. at ¶ 8; Dkt. 59 at ¶ 10).   Plaintiff walked toward his door, but Officer Ivancevich advised Plaintiff that he was not free to leave.   (Dkt. 59 at ¶ 12).   Plaintiff ignored Officer

Ivancevich, and Officer Ivancevich then told Plaintiff that he was under arrest for resisting an officer without violence.   (Id. at ¶ 13).   He placed his hand on Plaintiff's wrist, advising him to turn around.   (Id.).   Plaintiff refused to submit to arrest, stating, "No, I didn't do anything wrong."   (Id. at ¶ 14).   An altercation between Plaintiff and the Officers ensued. (Id.).

### 1.     Plaintiff's version of events

According to Plaintiff's deposition testimony, when he turned to go inside, Officer Ivancevich "grabbed [him] around the neck," with his thumb on the back of Plaintiff's neck and his fingers at the front of Plaintiff's throat.   (Pl. Dep. at 41, 44-45).   Officer Ivancevich tried to pull Plaintiff back, but Plaintiff used his right elbow in an "upper blast" to throw Officer Ivancevich's hands off him.   (Id. at 41, 45; Dkt. 59 at ¶ 15).   As a result, Officer Ivancevich's hand or arm struck Officer Freeman in the face.   (Pl. Dep. at 41-42, 45). Officer Freeman said, "I've been hit."   (Id. at 45-46).   Officer Ivancevich began punching Plaintiff, and Plaintiff put him in a headlock.   (Id. at 46-47; Dkt. 59 at ¶ 15).

Officer Ivancevich broke free of the headlock and retreated down the steps, onto a paved walkway in front of Plaintiff' house.   (Pl. Dep. at 48).   At this point, Officer Ivancevich was standing more than ten feet away from Plaintiff, and Officer Freeman was standing on the other side of Plaintiff, seven or eight feet away.   (Id.).   Although Plaintiff did not reengage with the Officers, Officer Freeman drew her Taser and deployed three cartridges, striking Plaintiff's left buttock, his right buttock, and his left hip.   (Id. at 52, 56; Dkt. 59 at ¶ 16).   The third Taser strike took Plaintiff to the ground, causing him to lose consciousness.   (Pl. Dep. at 52, 57, 66).

When Plaintiff regained consciousness, he was on his knees on the ground.   (Id.

at 58).   Plaintiff yelled for his wife to bring him ice packs because he was nauseated and thought he was going to vomit.   Approximately one second later, Plaintiff "was smashed in the face" by "a cold, hard, metal object."   (Id.).   Although Plaintiff did not see the object, he assumed it was a 4 D-Cell Maglite, which, according to Plaintiff, is pictured lying next to his head in photographs of the scene.   (Id. at 58-59, 62-63).   Plaintiff does not recall who swung the flashlight.   (Id. at 59, 63).   Plaintiff felt a gush of blood and experienced excruciating pain.   Plaintiff believes that this blow caused the fractures of his nose and orbital sockets.   (Id. at 59-60, 61-62).   Plaintiff's expert, William Gaut, testified that Plaintiff's injuries may have been delivered by a Kel-Lite flashlight or by multiple closed fisted blows directly to his face.   (Dkt. 47 "Gaut Dep." at 124).

Plaintiff yelled at his wife to get the camera and start photographing.   (Pl. Dep. at 61).   At that point, Plaintiff was face down on the ground, with Officer Ivancevich's knees on him.   (Id.).   Officer Ivancevich yelled at Plaintiff to give him his hands, while Plaintiff yelled at Officer Ivancevich to stop smashing his face into the ground.   (Id. at 63, 65).   The Officers pulled Plaintiff's hands out and he was handcuffed, placed in the back of a patrol car, and transported to the hospital.   (Id. at 65, 68-69).

As of the date of his deposition, August 19, 2014, Plaintiff had undergone four inpatient hospital surgeries, three of which were performed to correct the damage to his orbital sockets.   (Id. at 86).   Plaintiff had one additional surgery scheduled, in order to make his eyeballs look the same and to alleviate his double vision.   (Id.).   Plaintiff takes pain medication every day.   (Id. at 87-88).   He also suffered nerve damage that causes dry mouth, tingling in his cheek, and eye irritation.   (Id. at 88-89).

### 2.     The Officers' versions of events

According to the Officers, after Plaintiff denied doing anything wrong, the Officers advised the Plaintiff to stop going onto the lawn.   The Plaintiff then directed the Officers to take their concern up with the State Attorney's office and he became irate and belligerent, pointing his finger in the Officers' faces and speaking to them in a raised voice. Plaintiff then walked backwards, retreating toward the door of his home, placing his hand on his doorknob.   Ivancevich claims that because he did not know Plaintiff's name, he demanded that Plaintiff stop and provide the information and he advised him that he was not free to leave.   When Plaintiff ignored the officer and refused to provide the demanded information, Officer Ivancevicich advised Plaintiff that he was under arrest and he placed his hand on Plaintiff's wrist and advised him to turn around.

At that point, Plaintiff pushed Officer Ivancevich in his chest backwards and hit Officer Freeman in the face with his open left hand, knocking her back several steps. (Ivancevich Aff. at ¶ 14; Freeman Aff. at ¶ 20).   Officer Ivancevich grabbed both of Plaintiff's arms and placed him against the door of his house.   (Ivancevich Aff. at ¶ 15). Plaintiff then put Officer Ivancevich in a headlock.   Officer Ivancevich began striking Plaintiff in his stomach and upper thighs using his knees and elbows.   Due to his claimed fear of bodily harm or death, Officer Ivancevich also began to disengage the safety latch from his firearm holster.   (Id.).   Officer Ivancevich was able to pry Plaintiff's arms loose and step back several feet.   (Id. at ¶ 16).

Officer Freeman deployed her Taser, using three cartridges.   (Id.; Freeman Aff. at ¶ 22).   According to the Officers, the Taser had no effect.   (Ivancevich Aff. at ¶ 16; Freeman Aff. at ¶¶ 22-23).   Plaintiff then charged at Officer Ivancevich with a closed fist

raised to strike, attempting to punch him.   (Ivancevich at ¶ 16).   Officer Ivancevich blocked the punch, but Plaintiff ripped Officer Ivancevich's radio microphone from his uniform.   (Ivancevich at ¶¶ 16-17).   Plaintiff again attempted to strike Officer Ivancevich, who forced Plaintiff to the ground, commanding him to stop resisting.   (Id. at ¶ 18).   As Plaintiff and Officer Ivancevich continued to fight, Officer Freeman deployed a five-second Taser cycle.   (Id. at ¶ 19; Freeman Aff. at ¶ 29).   Although Plaintiff was again unfazed, Officer Freeman was able to secure Plaintiff's right hand in handcuffs.   (Id.; Ivancevich Aff. at ¶ 20).   After several additional attempts, with Plaintiff still resisting, the Officers placed his left hand in handcuffs.   (Freeman Aff. at ¶ 29; Ivancevich Aff. at ¶ 21).   According to Officer Ivancevich, once he and Plaintiff were on the ground, he struck Plaintiff in the face with a closed fist because it was his only accessible target area. (Ivancevich Aff. at ¶ 19).   Neither Officer mentions having hit Plaintiff with a flashlight.

Plaintiff was charged with the following offenses under Florida law: (1) two counts of battery on a law enforcement officer for striking Officer Freeman in the face and for grabbing Officer Ivancevich in a chokehold; (2) one count of assault on a law enforcement officer for attempting to punch Officer Ivancevich; (3) two counts of resisting an officer with violence for Plaintiff's actions to evade handcuffs; (4) one count of depriving an officer of means of communication for tearing Officer Ivancevich's radio from his uniform; and (5) two counts of resisting an officer without violence, for Plaintiff's attempts to flee into his house after being advised that he was under arrest.   (Freeman Aff. at ¶ 31; Dkt. 59 at ¶ 20).

On March 15, 2013, Plaintiff filed the instant action.   On September 25, 2014, Plaintiff filed a Second Amended Complaint, which is the operative complaint.   (Dkt. 35).

6

As a result of the Court's January 6, 2015, Order granting-in-part Defendants' motion to dismiss (Dkt. 42), the following claims remain for disposition: Section 1983 claims against the Officers for false arrest and excessive force (Counts I and II); a Section 1983 claim against the City (Count IV); state-law assault and battery claims against the Officers and the City (Counts V and VII), and a state-law negligence claim against the City for failure to train and supervise (Count IX).

Although Defendants filed their motion for summary judgment as to the "remaining claims," they do not address the state-law claims for assault and battery.    (Dkt. 44 at 1). Accordingly, this Order is limited to consideration of the Section 1983 claims and the negligence claim.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.   Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).   Which facts are material depends on the substantive law applicable to the case.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence viewed "in the light most favorable to the non-moving party."   Fennell, 559 F.3d at 1216.   A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court "that there is an absence of evidence to support the non-moving party's case."   Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (internal quotation marks omitted).

7

When a moving party has discharged its burden, the non-moving party must designate specific facts that demonstrate there is a genuine issue for trial.  Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

### A.   Qualified Immunity

Section 1983 of the Civil Rights Act of 1871 creates a cause of action for the deprivation of rights, privileges, or immunities secured by the federal Constitution or federal law, by any person acting under color of state law.  42 U.S.C. § 1983; Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998).  To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that (1) he has been deprived of a right, privilege, or immunity secured by the Constitution or federal law, and (2) the deprivation occurred under color of state law.  Id.; Griffin v. City of Opa–Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

The Officers assert the defense of qualified immunity.  Qualified immunity shields a law enforcement officer who is sued in his individual capacity for alleged federal constitutional violations that may arise during the performance of discretionary functions. Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (recognizing that "qualified immunity is a privilege that provides an *immunity from suit* rather than a mere defense to

liability") (internal quotation marks and alteration omitted)).   Qualified immunity applies so long as the officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (internal quotation marks omitted).   To invoke qualified immunity, the officer must first prove that the challenged action was within the scope of the officer's discretionary authority. Case, 555 F.3d at 1325.   Plaintiff does not dispute that the Officers make this threshold showing.

After an officer invokes qualified immunity, the plaintiff must then prove (1) that the officer violated a constitutional right and (2) that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." Id. at 1326 (internal quotation marks omitted).   In examining whether the officer violated the plaintiff's constitutional rights, the Court must consider "whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted." Maiorano v. Santiago, No. 6:05-cv-107-Orl-19KRS, 2005 WL 1200882, at *7 (M.D. Fla. May 19, 2005) (internal quotation marks omitted).   To show that the law was clearly established, Plaintiff may cite decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, in this case, the Supreme Court of Florida, that provide clear notice of the violation. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).   If an officer is reasonably mistaken, the officer should not face personal liability. Maughon v. Bibb County, 160 F.3d 658, 661 (11th Cir. 1998).   An officer is entitled to qualified immunity if the plaintiff fails to prove that (1) the officer violated the plaintiff's constitutional rights, and (2) the right was clearly established. McClish, 483 F.3d at 1237.   If the plaintiff fails to prove either prong, the officer is entitled

to qualified immunity as a matter of law.   Case, 555 F.3d at 1327.

**B.     False Arrest (Count I)**

A warrantless arrest carried out without probable cause violates the Constitution and can give rise to a claim under 42 U.S.C. § 1983; however, "the existence of probable cause at the time of arrest is an absolute bar to a section 1983 action for false arrest." Case, 555 F.3d at 1326–27 (internal quotation marks omitted).   Where qualified immunity has been asserted, "an officer need not have actual probable cause, but only *arguable probable cause.*"   Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003) (internal quotation marks omitted).   "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest."   Case, 555 F.3d at 1327 (internal quotation marks omitted).   Thus, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."   Hunter v. Bryant, 502 U.S. 224, 227 (1991) (internal quotation marks omitted).

Whether an officer possesses arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern."   Skop v. City of Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007) (internal citation omitted).   In connection with the instant motion, Defendants argue that the Officers possessed, at the very least, arguable probable cause to arrest Plaintiff for resisting an officer without violence, in violation of Fla. Stat. § 843.02, because the Officers were engaged in the lawful duty of investigating Plaintiff's trespass when he obstructed that investigation by turning to go back inside his house.   Defendants also argue that, once Plaintiff began physically fighting with the Officers, they had arguable probable cause to arrest Plaintiff for battery on a law

enforcement officer and depriving an officer of means of communication.[1]   As a result, Defendants maintain that they possessed arguable probable cause for the entire arrest. The Court addresses these arguments in turn.

Section 843.02 of the Florida Statutes provides: "Whoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor[.]"   To support a conviction under section 843.02, the alleged resistance or obstruction must occur while "the officer was engaged in the lawful execution of a legal duty." Storck v. City of Coral Springs, 354 F.3d 1307, 1315 (11th Cir. 2003).   Under Florida law, the lawful execution of a legal duty includes "an officer's (1) serving process, (2) legally detaining a person, and (3) asking a person for assistance with an ongoing emergency." Id.

Defendants do not contend that the Officers were serving process or asking for assistance with an ongoing emergency.   Instead, Defendants argue that the Officers were legally detaining Plaintiff, pursuant to a *Terry* stop,[2] in order to investigate a trespass.   A valid *Terry* stop requires that the Officers, under the totality of the circumstances and based on their collective knowledge, possess "an objectively reasonable suspicion that [Plaintiff] had engaged, or was about to engage, in a crime." United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).   Reasonable suspicion

---

[1] For purposes of the false arrest claim, the Officers do not attempt to distinguish between the actions of Officer Ivancevich and Officer Freeman. Cf. Brown v. City of Huntsville, 608 F.3d 724, 737 (11th Cir. 2010) ("Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action.")

[2] Terry v. Ohio, 392 U.S. 1 (1968).

requires "at least a minimal level of objective justification for making the stop," and "more than an inchoate and unparticularized suspicion or hunch." Id. (internal quotation marks omitted). In the qualified immunity context, the relevant question is whether there is "arguable" reasonable suspicion of criminal activity. Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000). The Court therefore considers whether the Officers had arguable reasonable suspicion to investigate a trespass.

Section 810.09 of the Florida Statutes prohibits unauthorized entry on property other than a structure or conveyance. Before liability will attach, the offender must be given notice against entry "by actual communication to the offender or by posting, fencing, or cultivation." Fla. Stat. § 810.09(1); D.T. v. State, 87 So. 3d 1235, 1239 (Fla. 4th DCA 2012); In Interest of B.M., 553 So. 2d 714, 716 n.2 (Fla. 4th DCA 1989). A police officer may provide a trespass warning for an owner, but he does so as the owner's designee, not in any official capacity. Rodriguez v. State, 29 So. 3d 310, 312 (Fla. 2d DCA 2009). Thus, "a stop merely to issue a trespass warning is not a *Terry* stop, but rather a consensual encounter." Id. at 311; Gestewitz v. State, 34 So. 3d 832, 834-35 (Fla. 4th DCA 2010).

Conversely, if an officer has reasonable suspicion of a prior entry onto property and warning, the officer may conduct a *Terry* stop to investigate the subsequent trespass. Id.; D.T., 87 So. 3d at 1239. Reasonable suspicion to investigate a trespass requires some suspicion that the offender had entered the property despite previously being given express notice against entry, "as a trespass warning is a prerequisite to that crime." Gestewitz, 34 So. 3d at 835.

Defendants maintain that the Officers possessed arguable reasonable suspicion

to investigate a trespass because the Officers knew that Mr. Roth had previously warned Plaintiff to stay off his property, and the Officers also knew that Plaintiff returned to Mr. Roth's property on March 8, 2011, after Mr. Roth warned Plaintiff against entry.   In support, Defendants cite Mr. Roth's deposition testimony regarding his communication with the police on March 8, 2011:

> Q.      [W]hen you called the police the evening of his arrest and the two officers arrived, did you explain to them that Mr. Florence had been trespassing on your property in the past?
>
> A.      I mentioned that I had a neighbor that wouldn't quit coming on the property and there's nothing that – that he stated that there's nothing that I could do to stop him.
>
> Q.      Okay. So you told him that you had a neighbor who was coming on your property, even though you told him not to, and he said, "There's nothing you can do about it"?
>
> A.      Correct.
>
> Q.      Okay.   And did you tell the officer that you had made it clear to Mr. Florence that he was not welcome to come on your property?
>
> A.      I don't recall that.
>
> Q.      Okay.   Can't recall one way or the other?
>
> A.      Yeah.   I just – I explained the purpose of why they were there, because they asked me.
>
> Q.      Yeah, and I think you said that when you called the dispatcher, the non-emergency line, you explained the situation as well.
>
> A.      Right.
>
> Q.      So whoever that person was that took your phone call, you explained that Mr. Florence had been on your property unwelcome before but he told you there was nothing you could do about it?
>
> A.      Correct.

(Roth Dep. at 17-18).   Earlier in his deposition, Mr. Roth also testified: "[T]he police

showed up, and I explained to them the nature of the call, which was Mr. Florence basically refused to stay off my property and he stated that there is nothing I can do to stop him.   And that's why they were there."   (Id. at 6).

As additional factual support that the Officers knew of a prior warning, Defendants cite the Officers' own affidavits.   For instance, Officer Ivancevich avers: "Mr. Roth informed us that Plaintiff refused to stay off of his lawn and had entered his property after Mr. Roth had requested him to not to return to his lawn."   (Ivancevich Aff. at ¶ 4).   More specifically, Officer Freeman avers: "Mr. Roth informed us that he had advised Plaintiff 2-3 weeks prior to the March 8, 2011, incident that he did not want Plaintiff maintaining his yard and to not come back onto his property."   (Freeman Aff. at ¶ 6).

The Officers' recitation in their affidavits of what Mr. Roth said to them is inadmissible hearsay.   Moreover, Plaintiff points to sufficient evidence to warrant an inference in his favor that the Officers did not have knowledge of a prior warning.   That evidence includes Mr. Roth's equivocal testimony and the fact that it does not pair with the Officers' recitation of what Mr. Roth said to them, except when he was being grossly led in questioning by defense counsel.   Further, as the Court previously observed, Officer Ivancevich's own report indicates that he was only attempting to issue a trespass warning. (Dkt. 1 at 33).   Consistent with this report, Officer Freeman avers that Officer Ivancevich told Mr. Roth they would just give Plaintiff a trespass warning.   (Freeman Aff. at ¶ 8). This, of course, is inconsistent with Officer Ivancevich's new version of events, modified with the benefit of an appreciation of the applicable law on trespass, that he was conducting a *Terry* stop.   In addition, Plaintiff testified that he had not had a problem with Mr. Roth prior to March 8, 2011, other than when Mr. Roth told Plaintiff that he did not

14

want Plaintiff to repair his sprinkler system.   (Pl. Dep. at 21-23; Roth Dep. at 16-17).

For purposes of qualified immunity, this Court must view the facts in the light most favorable to Plaintiff, so as to have "the plaintiff's best case in hand."   Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005).   Viewing the evidence in the light most favorable to the Plaintiff, Mr. Roth's testimony is equivocal as to whether he told the Officers that he had warned Plaintiff *prior to* March 8, 2011 not to enter his property. Indeed, Mr. Roth specifically testified that he could not recall whether he told the Officers that he had made it clear to Plaintiff that he was not welcome.   Thus, the Officers did not possess arguable reasonable suspicion to conduct a *Terry* stop to investigate a trespass; instead, the Officers could only conduct a consensual encounter to issue Plaintiff a trespass warning, as Mr. Roth's designee.   Gestewitz, 34 So. 3d at 834-35.

Accordingly, under Plaintiff's best-case scenario, because the Officers were not lawfully detaining Plaintiff, Plaintiff was entitled to walk away from their consensual encounter, and the Officers did not have even arguable probable cause to arrest Plaintiff for resisting an officer without violence under Fla. Stat. § 843.02.   See Windsor v. Eaves, 614 F. App'x 406, 410-11 (11th Cir. 2015) (holding that officers did not have arguable probable cause to arrest for resisting without violence under Fla. Stat. § 843.02, where they were not legally detaining the plaintiff); accord Jessup v. Miami-Dade County, 440 F. App'x 689, 693 (11th Cir. 2011); Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998) (affirming denial of motion for summary judgment based on qualified immunity where "[n]o reasonable officer could believe that probable cause existed to arrest" for resisting without violence, where the officers were not engaged in lawful discharge of their

official duties).[3]

Defendants alternatively argue that the Officers possessed probable cause to arrest Plaintiff for battery on a law enforcement officer and depriving an officer of means of communication, as Plaintiff does not dispute that he put Officer Ivancevich in a headlock or that he tore Officer Ivancevich's radio from his uniform.   Defendants further maintain that probable cause for these offenses validates the entire arrest.   For the reasons set forth below, the Court holds that Defendants fail to demonstrate entitlement to summary judgment at this juncture, and the false arrest claim is held in abeyance, pending a hearing.

Probable cause is measured by the facts known to the arresting officer at the time of the arrest.   Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." (internal quotation marks omitted)).   Here, at the time of Plaintiff's arrest for resisting an officer without violence, the Officers had no reason to arrest Plaintiff for battery on a law enforcement officer, assault on a law enforcement officer, resisting an officer with violence, or depriving an officer of means of communication, as the events underlying those offenses had not yet occurred.   Indeed, under Plaintiff's version of the facts, it was the arrest for resisting without violence that set in motion the physical altercation.   That fact distinguishes the instant case from Defendants' authority, Stachel v. City of Cape Canaveral, 51 F. Supp. 2d 1326, 1331 (M.D. Fla. 1999), as well as other similar cases.   E.g., Sada v. City of

---

[3] The Court does not reach Plaintiff's alternative argument that the Officers were required to obtain prior written authorization from Mr. Roth to deliver a trespass warning.   (Dkt. 54 at 5).

Altamonte Springs, 434 F. App'x 845, 851-52 (11th Cir. 2011) (finding that probable cause to arrest for battery rendered the question of probable cause to arrest for disorderly conduct moot, where both offenses occurred before the arrest); Skop, 485 F.3d at 1138-42 (evaluating whether officer had probable cause to arrest for either of two offenses, both of which were alleged to have been completed before the plaintiff's arrest).

More problematic, neither side meaningfully addresses whether the Officers had arguable probable cause to arrest Plaintiff for battery on a law enforcement officer or the remaining offenses.   Under Florida law, one of the elements of battery on a law enforcement officer is that the victim-officer was engaged in the lawful performance of his duties.   K.H. v. State, 8 So. 3d 1155, 1156 (Fla. 3d DCA 2009).   Where an officer has no probable cause to arrest an individual, he is not engaged in the lawful performance of his duties.   Id.   Neither party has addressed the impact of this law, if any, on the claim of qualified immunity in this case.   In fact, the parties do not reference the legal elements of the remaining charges for battery on a law enforcement officer, assault on a law enforcement officer, resisting an officer with violence, or depriving an officer of means of communication.   For example, the parties have not advised the court whether resisting an officer with violence also requires that the officer be engaged in the lawful execution of his duties.   The elements of these offenses, as well as any affirmative defenses to these offenses, will inform the Court's decision as to whether the officers are entitled to qualified immunity for their conduct, which caused grave injuries to Plaintiff.

Just by way of example, the Eleventh Circuit recently held in Morris v. Town of Lexington that a Fourth Amendment claim could not lie for an arrest for assault where the plaintiff punched an officer who was unlawfully in the plaintiff's house and who had first

shoved the plaintiff without provocation.   748 F.3d 1316, 1325 (11th Cir. 2014).   This is so, the court found, because under Alabama law, self-defense is a statutory affirmative defense to an assault charge.   Thus, the court concluded that, "the officers had probable cause, or at the very least arguable probable cause, to believe that [the plaintiff] had committed an assault."   Id.   The fact that the plaintiff had a defense to the charge that could be (and in fact was) successfully asserted at his criminal trial did not vitiate the arguable probable cause for the arrest.   As a result, the plaintiff failed to state a Fourth Amendment claim based on the plaintiff's arrest after he punched the officer.   Id.

Notably, prior to Morris, a panel of the Eleventh Circuit held that a plaintiff's right to resist arrest under Georgia law was relevant to the arguable probable cause analysis. See Merenda v. Tabor, 506 F. App'x 862, 867 (11th Cir. 2013) (holding that officers lacked arguable probable cause to arrest the plaintiff for obstruction because the plaintiff had the right to resist an unlawful arrest under Georgia law); see also Sada, 434 F. App'x at 850-51 (noting some inconsistency in the treatment of affirmative defenses in assessing arguable probable cause).   Here, neither side addresses pertinent issues such as whether self-defense is an affirmative defense to battery on a law enforcement officer under Florida law or whether it is viewed as the absence of proof of the element of the officer's lawfulness in the first instance,[4] whether resisting with violence requires proof that the underlying arrest was lawful in the first instance, or whether the absence of a lawful basis for an arrest is only a defense that does not affect arguable probable cause. Nor do the parties address whether the relevant law as it relates to a claim under Section 1983 was clearly-established at the time of Plaintiff's fateful encounter with the Officers.

---

[4] It would seem unlikely that a self-defense claim would lie against an officer lawfully engaged in securing an individual with probable cause or arguable probable cause.

See id. at 851 ("we cannot say that the law regarding affirmative defenses was so clearly established as to have provided fair warning to the Defendants that their actions were unconstitutional.").

Based on the foregoing, the Court stays consideration of Defendants' motion as to Count I.   As discussed below, determining the proper basis for an arrest is also a relevant factor in assessing the level of force that would have been reasonable to secure Plaintiff, for the purposes of Plaintiff's excessive force claim in Count II.   The Court understands that the parties will be mediating this action on Thursday December 10, 2015.   If that mediation is unsuccessful, the Court will conduct a hearing in this matter to permit the parties to address the issues they have omitted in their pleadings.

## C.   Excessive Force (Count II)

 "[I]t is well-established that if no probable cause authorizes an arrest, *any* use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment."   Turner v. Jones, 415 F. App'x 196, 201 (11th Cir. 2011); Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008) ("In the absence of probable cause, Herbert was not justified in using any force against Reese.").   In this case, however, Plaintiff raises a discrete claim for excessive force.   (See Dkt. 35 at ¶ 22).   Plaintiff argues that, even assuming his arrest was supported by probable cause, the amount of force used to effect that arrest was excessive.   Williams v. Sirmons, 307 F. App'x 354, 360 n.3 (11th Cir. 2009).

In the context of an investigatory stop or arrest, excessive force claims arise from the Fourth Amendment's prohibition against unreasonable seizures.   Graham v. Connor, 490 U.S. 386, 394 (1989).   "An officer's use of force is excessive under the Fourth Amendment if the use of force was objectively unreasonable in light of the facts and

circumstances confronting the officer." Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011) (internal quotation marks and alteration omitted).   The Court must judge reasonableness from the perspective of a "reasonable officer on the scene" without the benefit of hindsight and allowing for the fact that officers are often forced to make split-second judgments regarding the use of force in "tense, uncertain, and rapidly evolving" circumstances.   Id. (internal quotation marks omitted).   In evaluating whether the force was excessive, the Court must examine the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.   Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015).   The Court also considers the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted.   Id.

In the Second Amended Complaint, Plaintiff alleges that he was forcibly grabbed, Tasered, and beaten on the head, face, and torso with a metal object.   (Dkt. 35 at ¶ 13). These allegations are consistent with Plaintiff's deposition testimony, which is detailed above. Nonetheless, in connection with the instant motion, Defendants fail to take Plaintiff's version of events as true.   For instance, Defendants do not acknowledge Plaintiff's testimony that, after Officer Freeman deployed three Taser cartridges, Plaintiff lost consciousness.   Nor do they address Plaintiff's testimony that, within one second of regaining consciousness, he was struck in the face with a heavy flashlight,[5] knocking him

---

[5] Even accepting that the record is inconclusive as to whether Plaintiff was struck with a flashlight or was pummeled by three to four closed-fist punches at the hands of Officer Ivancevich, the outcome is no different.   Because it is not clear which officer (if anyone) hit Plaintiff with the flashlight, the Court declines to address Officer Freeman's argument that she is separately entitled to qualified immunity based on her use of the Taser.   Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007).

to the ground and breaking his nose and orbital sockets.    For purposes of this discussion, the Court takes these facts as true and turns to consideration of the relevant factors.

As to the first factor, the severity of the crime at issue, the Court has not yet determined whether the operative offense against which to measure the extreme level of force is battery on a law enforcement officer or the other charges.    Moreover, although the severity of the crime is one factor in the analysis, that factor is not dispositive.    E.g., Walker v. City of Riviera Beach, 212 F. App'x 835, 836 n.1, 838 (11th Cir. 2006) (holding that officer used excessive force by "slamming" gun against the plaintiff's forehead, where the crime at issue was fleeing or attempting to elude a law enforcement officer, a third-degree felony).

At the hearing, the Court will also explore with the parties whether the record indicates that Plaintiff was posing a serious threat to the safety of the Officers or others. See id. (explaining that "no threat or risk existed that would have justified" the force used, despite the fact that plaintiff was still in his car and unsecured).    According to Plaintiff, he had just regained consciousness and he was on his knees yelling for his wife to bring him ice packs, and he was not attempting to flee or actively resisting arrest.    Compare Baltimore v. City of Albany, 183 F. App'x 891, 898-99 (11th Cir. 2006) (holding that hitting the plaintiff in the head with a flashlight constituted excessive force, in part because there was no indication that the plaintiff "was going to escape the grasp of the officers," despite the fact that plaintiff was unsecured), with Benton v. Hopkins, 190 F. App'x 856, 859-60 (11th Cir. 2006) (holding that there was no excessive force where baton strikes occurred after the plaintiff started to back away and landed on top of another officer, pinning him down); see also Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005)

(explaining that there was no indication that the plaintiff made any threatening moves toward the police, and that, when he was struck in the head, he arguably had not had time to obey commands to drop his knife).   Indeed, according to Plaintiff, even earlier in the altercation---when he was Tasered---he had not reengaged with the Officers.   Cf. Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280-81 (11th Cir. 2004) (explaining that "courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story," where the facts indicated that the suspect continually resisted capture up until the point he was fettered).

The remaining factors suggest that the force used was excessive.   While some degree of force was needed to handcuff Plaintiff if his arrest can be justified, a jury could conclude on Plaintiff's facts that the amount of force used was disproportionate under the circumstances.   At least one unpublished Eleventh Circuit case holds that striking a suspect in the head with a heavy flashlight constitutes the use of deadly force.   Baltimore, 183 F. App'x at 898; see also Mercado, 407 F.3d at 1154-55, 1160 (holding that shooting the plaintiff in the head with a baton, using a "Sage Launcher," was deadly force). Additionally, assuming that the strike or the fist-pounding caused the fractures to Plaintiff's nose and orbital sockets, those injuries were significant and long-term.   Plaintiff has undergone at least four surgeries to correct the damage, and he continues to suffer from double vision, pain, and nerve damage.

The Court is mindful that the Officers were facing a situation that was "tense, uncertain, and rapidly evolving."   Fils, 647 F.3d at 1287 (internal quotation marks omitted).   Plaintiff's best-case version of the facts, which the Court accepts as true for purposes of this motion, may not carry the day at trial.   Again, however, the Court holds

its final decision on this point in abeyance until it can assess on hearing, if one is necessary after the mediation, which offense or offenses it can legally consider on summary judgment in assessing the degree of force that was warranted under the circumstances.

### D.   Municipal Liability (Count IV)

In Count IV, Plaintiff asserts that the City is liable for authorizing, permitting, and tolerating the custom and practice of the use of excessive force in delivering trespass warnings.   (Dkt. 35 at ¶ 26).   "Liability under § 1983 may not be based on the doctrine of respondeat superior."   Craig v. Floyd County, 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotation marks and alteration omitted).   A municipality may only "be held liable under § 1983 if the plaintiff shows that a 'custom' or 'policy' of the municipality was the 'moving force' behind the constitutional deprivation."   Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citing Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658, 690-694 (1978)).   "[T]here must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"   Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

Thus, to impose liability upon a municipality under 42 U.S.C. § 1983, a plaintiff must establish "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."   McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).   "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf

of the municipality."   Sewell, 117 F.3d at 489.   "A custom is a practice that is so settled and permanent that it takes on the force of law."   Id.

Alternatively, a plaintiff may demonstrate an official policy by showing that the municipality had a "policy of inadequate training or supervision."   Mingo v. City of Mobile, 592 F. App'x 793, 799 (11th Cir. 2014).   Under this theory, a facially lawful municipal action may violate the plaintiff's rights if it "was taken with 'deliberate indifference' as to its known or obvious consequences."   Id. (quoting Bd. of Cnty. Commr's of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997)) (internal quotation marks omitted). In order to establish a municipality's deliberate indifference, "a plaintiff must demonstrate that the municipality knew of the need to train in a particular area and that it made a deliberate choice not to take any action."   Id. (citing Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).   Deliberate indifference may be demonstrated in two ways: (1) by alleging "a widespread pattern of similar constitutional violations by untrained employees," or (2) "by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation."   Id. at 799-800 (citing Connick v Thompson, 563 U.S. 51 (2011)).

In a conclusory sentence, Plaintiff asserts: "The Defendant Officers' testimony that they believed they were acting in accordance with City policy, coupled with the City's knowing ratification of the Officers' actions against the Plaintiff, allow a reasonable jury to infer the existence of a 'de facto' policy allowing officers to seize reluctant recipients of trespass warnings and to use excessive force in doing so."   (Dkt. 54 at 12).   Yet Plaintiff identifies no official City policy.   Plaintiff also fails to identify "factual situations that are substantially similar to the case at hand," sufficient to demonstrate a municipal custom.

Mercado, 407 F.3d at 1162.   And to the extent that Plaintiff alleges a failure to train or supervise, he cites no evidence supporting an inference that the City did, in fact, fail to train or supervise its officers, or that the City was deliberately indifferent to a need for training.

With respect to Plaintiff's argument that the City knowingly ratified the Officers' conduct, Plaintiff again fails to cite record evidence in support of this argument. Moreover, the Court previously explained that *post-hoc* ratifications do not demonstrate that City action was the "moving force" behind a constitutional violation.   (Dkt. 34 at 25-28); Thomas ex rel. Thomas v. Roberts, 261 F.3d 1160, 1174 (11th Cir. 2001).   While ratification may lend plausibility to a claim that a municipal policy or custom exists (Dkt. 34 at 31), Plaintiff provides no other evidence of a policy or custom, sufficient to impose liability on the City.

Plaintiff's bare assertions, supported by no record evidence, fail to discharge his burden as the party opposing summary judgment.   Evers, 770 F.2d at 986.   Defendants' motion for summary judgment is accordingly granted as to the Section 1983 claim against the City (Count IV).

## E.     Failure to Train and Supervise (Count IX)

Finally, Defendants move for summary judgment on Plaintiff's state-law claim against the City for negligent failure to train and supervise.   Defendants argue that Plaintiff presents no evidence on this claim, and, alternatively, that the claim is barred by sovereign immunity.   Plaintiff provides no response to this portion of Defendants' motion. (Dkt. 54).

A claim for negligent training requires Plaintiff to demonstrate that the City "was

negligent in the implementation or operation of [its] training program." <u>Mercado</u>, 407 F.3d at 1162.   A claim for negligent supervision arises "when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." <u>Dep't of Envtl. Prot. v. Hardy</u>, 907 So. 2d 655, 660 (Fla. 5th DCA 2005); <u>Mercado</u>, 407 F.3d at 1162.

Plaintiff introduces no evidence suggesting that the City was negligent in implementing or operating its training program.   Plaintiff likewise introduces no evidence suggesting the City had notice of any officer's unfitness.   Accordingly, Defendants' motion for summary judgment is due to be granted as to Count IX, and the Court does not reach Defendants' alternative argument that the claim is barred by sovereign immunity.

## IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED:**

(1) Defendants' Motion for Summary Judgment (Dkt. 44) is:

    (a) **GRANTED** as to Counts IV and IX of the Second Amended Complaint;

    (b) **HELD IN ABEYANCE** as to Counts I and II.

(2)   On or before Friday, December 11, 2015, Plaintiff shall file a notice informing the Court of the outcome of the mediation scheduled for December 10, 2015.   The Parties (lead counsel AND the individual Plaintiff and Defendants) shall also confirm their availability in person for a hearing on the motion in the afternoon of December 16, 2015.

**DONE** and **ORDERED** in Tampa, Florida, on this 9th day of December 2015.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies to:
All Counsel of Record
Any Unrepresented Party